

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Richmond Division)

TRUMP TIGHT, LLC, )
D/B/A TRUMP RESTAURANT, )
AND LOUNGE, )
        )
       *Plaintiff,* )
        )
        )
v. )
        )
        )
RAYMOND R. BELL, )
        )
-AND- )
        )
VINCENT B. GIVENS, )
        )
       *Defendants.* )

Civil Action No.: ⊘:15CV175

JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff Trump Tight, LLC ("Trump" or "Plaintiff"), by and through counsel, hereby files this Complaint against Defendants, Raymond R. Bell ("Defendant" or "Bell") and Vincent B. Givens ("Defendant" or "Givens"). In support thereof, Plaintiff states as follows:

## INTRODUCTION

1. As specifically described herein, this is a case of public corruption and the victimization of a small and lawful business by public servants, including an elected official, entrusted by the public with the responsibility to serve and to protect.

2. Defendant Raymond R. Bell has been Sheriff of Sussex County since 2007, a county with a population of fewer than 12,000 persons. In that position, he exercises significant authority in public affairs in the County and, through his office as Sheriff, the ability and sometimes the apparent authority to have significant power over private and commercial affairs within the

1

County. In the case described herein, when Bell's de facto control over private, commercial affairs was challenged, he responded to the challenge with illegal attempts to intimidate and ruin the business that challenged him.

3. Vincent B. Givens is a Deputy of Sussex County with the designated rank of Lieutenant. He is in charge of jail operations for Sussex County, a position that gives him the flexibility to manage with Bell's consent and assistance and for Given's personal benefit a collection of select deputies who use the apparent authority of their office and the color of law to provide so-called security services at a price to local businesses, conducting themselves in violation of County ordinances and the laws of the United States and the Commonwealth of Virginia, including using fraudulent representations of the law and using the remote orders of the Sheriff to compel the Plaintiff to continue to pay for the so-called services of the deputies when the Plaintiff no longer wished to do so.

4. Additionally, Bell and Givens used their positions in office, the color of law, and their apparent authority, together with their command over the deputies providing the so-called security services, to exercise unlawful control over local businesses and to prevent local businesses from engaging in lawful conduct of which Bell or Givens disapprove.

5. From October 2013 to July 2014, Defendants Raymond R. Bell and Vincent B. Givens, willfully, intentionally, and without lawful justification combined, associated, agreed, mutually undertook or concerted together and with others and thereby, *inter alia*:

    a. secured for Givens and other deputies payments on at least a weekly basis from Plaintiff for so-called security services of deputies through illegal means including by, *inter alia*:

        i. violation of local ordinances and general orders regulating such conduct,

2

    ii.  demanding the payments be in cash and then refusing to comply with Trump's legitimate demands for information to report the payments appropriately to the taxing authorities,

    iii.  fraudulently misrepresenting the local ordinances and policies to Trump's management so as to deny Trump the right to employ substitute security,

    iv.  denying Trump the right to exercise control over the deputies as it would have in an employer-employee relationship, through such means as exercising control over the selection of deputies to work at the facilities, setting the schedules of the deputies, setting the hourly rate of the deputies, setting the number of deputies working each night, and dictating the activities of the deputies while working,

    v.  implicit or veiled threats of reprisals for noncompliance, and

    vi.  explicit threats of arrest to collect a disputed sum;

b.  enforced arbitrary and unlawful occupancy limits on Trump's facilities contrary to the desires of Trump's management below that which was duly established by permit;

c.  banned the admission of eighteen- to twenty-year-olds to Trump's facilities without lawful authority or justification;

d.  enforced that ban on the admission of eighteen- to twenty-year-olds to Trump's facilities on July 12, 2014 under color of law but without lawful authority or justification by *inter alia*:

    i.  blocking the admission of such prospective patrons from the club, over the objections of Trump's managers,

    ii.  blocking the admission of any prospective patrons of the club for a time, over the objections of Trump's managers,

   iii.  through oral attempts to intimidate and berate the management of Trump,

   iv.  using prospective threats that they would

       1.  immediately shut down the business without pre- or post-seizure judicial or administrative remedies,

       2.  contact the ABC agents and get them to assist in immediately shutting down the business,

       3.  immediately revoke the business's ABC license,

       4.  report to the family members of Trump's managers the managers' disobedience of the Sheriff's unlawful directions,

       5.  contact the lessor of Trump's facilities to get him to terminate the lease;

    v.  entering the facilities in force and expelling patrons from the facilities under color of law, and directing would-be patrons to go home, including with threats of arrest, and directing Trump's management to reimburse patrons the cover charge;

   vi.  contacting, or representing that they contacted, an agent of the ABC who supported their actions;

  vii.  by contacting, or representing that they contacted, the lessor of Trump's facilities and directing or intimidating him into not renewing the lease or in terminating the lease;

    e.  stating, under color of law and with implicit threats of reprisals, but without lawful justification or support, that Trump's ABC license was revoked as of July 14, 2014;

    f.  directing, under color of law and with implicit threats of reprisals, but without lawful justification or support, that Trump's management was not to reopen the business;

    g.  directing, under color of law and with implicit threats of reprisals, but without lawful justification or support, that Trump and its management was to leave the county within the week of July 12, 2014.

6.  Defendants' conduct constitutes, *inter alia*, violations of Trump's right to due process and equal protection under the Fourteenth Amendment to the Constitution of the United States, an unlawful seizure of the business's property in violation of the Fourth Amendment to the Constitution of the United States, as well as conspiracy to harm a business, in violation of Virginia Code § 18.2-499 and -500.

**PARTIES AND RELEVANT NON-PARTIES**

**Plaintiff**

7.  Plaintiff Trump Tight, LLC is a Virginia domestic limited liability company, duly registered with the State Corporation Commission. It had its principal place of business at 24197 S. Halifax Rd, Jarratt, Virginia 23867, in Sussex County, Virginia. The facilities are a little more than a mile outside the Town of Jarratt, Virginia. This was private property leased from Earl Cross and Earl Cross Holding, Inc. Trump lawfully operated a restaurant, bar, and lounge at that address, doing business as The Trump Restaurant and Lounge.

**Defendants**

8.  Defendant Bell is an individual and resides in the Commonwealth of Virginia.  At all times relevant to the facts and allegations herein, Bell was the Sheriff of Sussex County, Virginia, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office.

9.  Defendant Givens is an individual and resides in the Commonwealth of Virginia. At all times relevant to the facts and allegations herein, Givens was a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment.

**Relevant Non-Parties**

10. Certain other deputies not sued in this action were integral parts to the schemes presented herein. These individuals include the following:

    a.  Deputy Simmons is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

    b.  Deputy Darden is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as

6

described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

c.  Deputy Johnson is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

d.  Deputy Wyche is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

e.  Deputy Rawls is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

f.  Deputy Anthony is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and

employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

g.  Deputy Adams is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

h.  Deputy Pittman is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

i.  Deputy Skette is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

j.  Deputy Stevens is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been

undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

k. Deputy Turner is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

l. Deputy Moore is an individual and was at all times relevant herein a deputy with the Sussex County Sheriff's Office, though some of his actions may have been undertaken under color of law but in fact outside the scope of his office and employment. Upon information and belief, he provided so-called security services, as described herein, at Trump and received a portion of the proceeds from the scheme alleged herein.

11. At all times relevant herein, each and every non-party named in the preceding paragraph was acting in combination, association, agreement, mutual undertaking or concerted action together one or both of the named Defendants, and further, as described in more detail below.

## SUBJECT MATTER JURISDICTION

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Plaintiff's claims arise under 42 U.S.C. § 1983, and the Fourth and Fourteenth Amendment to the Constitution of the United States.

13. This Court also has supplemental jurisdiction over Plaintiff's state law claim under 28 USC § 1367, as these claims are intricately related to and arise out of a common nucleus of operative facts as the Plaintiff's federal claims and form part of the same case or controversy.

## VENUE

14. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this Complaint occurred in this district. Additionally, venue is proper in this district under 18 U.S.C. § 1965(a), as the defendants reside in and transact their affairs in this district.

## PERSONAL JURISDICTION

15. The exercise of personal jurisdiction over the Defendants is reasonable and proper as the Defendants reside, work, and/or otherwise transact business in the Commonwealth of Virginia. Further, jurisdiction over the Defendants is proper under 18 U.SC. § 1965(a).

## SPECIFIC FACTUAL ALLEGATIONS

### Establishment and Licensing of the Business

16. On or about July 23, 2013, Trump was successfully registered with the Virginia State Corporation Commission as a limited liability company. See Exhibit A (Certificate of Organization).

17. On or about September 1, 2013, Trump commenced a one-year lease of the facilities at 24197 S. Halifax Rd, Jarratt, Virginia 23867, in Sussex County, Virginia with Earl Cross and Earl Cross Holding, Inc., with a fixed minimum rent of $25,200.

18. The facilities had previously been used as a bar and lounge by Earl Cross or a related company as well as other individuals or companies. Earl Cross advised the managers of Trump that security at the facilities in the past had been provided by deputies of the Sussex County

Sheriff's Office under the management of Givens and Bell. The established rate was $25 per hour per deputy. This was comparable to private security services. Earl Cross notified Givens and Bell of Trump's opening date at the facilities.

19. Earl Cross also recommended to Trump's management that Trump make cash payments to Bell through Givens to ensure that Bell would not interfere in and would assist in their business. He offered examples of how Bell had assisted other businesses in the past that were on favorable terms with Bell, such as by protesting the legitimate actions of ABC agents at the business. Trump's management refused to provide payments or gratuities to Bell, as they understood those payments or gratuities to be illegal bribes as Bell would not be providing security or other services to Trump.

20. On or about September 12, 2013, Trump received its license to operate a food establishment under the name The Trump Restaurant and Lounge at 24197 South Halifax Street, Jarratt, Virginia 23867 from the Virginia Department of Health. Exhibit B (VDH Business License). This license duly established the maximum lawful occupancy of the facilities as 624 persons.

21. On or about September 25, 2013, Trump obtained its retail license to lawfully serve alcoholic beverages at the facilities from September 25, 2013 to August 31, 2014. Exhibit C (ABC License). Pursuant to this license, Trump was authorized to sell wine, beer, and mixed beverages.

**Deputies Work Security**

22. Upon opening its doors on or about October 6, 2013 to do business as a restaurant, bar, and lounge, Trump employed private individuals to serve as security personnel inside the facilities who were not off-duty or on-duty law enforcement officers.

23. Additionally, beginning on or about October 6, 2013, whenever Trump opened its doors for serving patron at nights on weekends or holidays, Givens and several deputies appeared in uniform at the facilities to provide the aforementioned security services <u>outside and at the door</u> of the facilities. These so-called security services were not governed by a written contract.

24. Trump did not have meaningful control over the deputies. Trump was not permitted to select which deputies would work at the establishment, how many deputies would work on each night, which deputies would work on each night, or the tasks of the deputies. At all times Givens or his substitute had the immediate command at the scene over the conduct of the deputies. Givens, however, indicated on various occasions that he was managing the deputies at the direction of Bell. The deputies refused on several occasions to follow the directions of Trump's management. As stated below, Givens and his deputies began to enforce unilaterally restrictions on the business of Trump that were contrary to the desires of Trump's management, without lawful basis.

25. Each night after providing these services, Givens or his substitute would present himself to collect payment of the deputies and himself. Management of Trump sought to provide payment by check, but Givens insisted on cash payments. Management of Trump repeatedly asked for information from Givens so as to notify the IRS and Virginia Department of Taxation of the payments the deputies were receiving. Givens and the deputies refused or declined to provide this information.

**Givens Misleads Trump**

26. On or about December 14, 2013, Givens advised the management of Trump that the Sheriff would be increasing the rates Trump would have to pay for the services of the deputies. Consequently, Trump's management demanded to know whether Trump could hire private

security in place of the deputies. Givens falsely indicated that a local ordinance required Trump to have the deputies present on nights when Trump was open to the public as a lounge, and the deputies would continue to charge Trump for being present. Upon information and belief, Givens knew or believed this information to be false, but stated this so as to induce Trump to continue using and paying Givens and the deputies.

27. Unknown to Trump at the time, no federal, state or county laws, regulations, or policies mandated Trump to pay deputies to provide unwanted security services, or mandated that the deputies had to be present at Trump's facilities. As discussed below, the local ordinances and General Orders provided otherwise.

28. Based on this false and fraudulent information, Trump continued to pay five to eight deputies to be present each weekend and holiday Trump was open from December 14, 2013 until July 12, 2014. This included between December 14 and December 31:

    a. On December 14, 2013, Trump was obliged under this fraudulent pretext to pay $1,000.00 to Givens for the presence of eight uniformed officers at the Trump facilities.

    b. On December 21, 2013, Trump was obliged under this fraudulent pretext to pay $750.00 to Givens for the presence of six uniformed officers at the Trump facilities.

    c. On December 24, 2013, Trump was obliged under this fraudulent pretext to pay $625.00 to Givens for the presence of five uniformed officers at the Trump facilities.

    d.  On December 25, 2013, Trump was obliged under this fraudulent pretext to pay $625.00 to Givens for the presence of five uniformed officers at the Trump facilities.

    e.  On December 28, 2013, Trump was obliged under this fraudulent pretext to pay $750.00 to Givens for the presence of six uniformed officers at the Trump facilities.

    f.  On December 31, 2013, Trump was obliged under this fraudulent pretext to pay $875.00 to Givens for the presence of six uniformed officers at the Trump facilities.

**Deputies Work at an Increased Rate**

29. On or about January 4, 2014, Bell through one of his deputies delivered a letter to Trump (under the erroneous name of Club Trump) signed by Bell as Sheriff on official Sheriff's Office letterhead stating in relevant part: "This is to notify you that effective January 1, 2014 the hourly rate for security at club events is increased to $35.00 per hour per deputy." See Exhibit D (Letter from Sheriff Bell, January 3, 2014). Though Trump did not want to make such payments or have the so-called service of the officers at that rate, it did so based on the prior misrepresentation of the law and the fear that the failure to do so could result in fines, management being jailed, losing necessary licenses, or the business being closed.

30. Under this new rate:

    a.  On January 4, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

14

b.  On January 11, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

c.  On January 18, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

d.  On January 25, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

e.  On February 1, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

f.  On February 8, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

g.  On February 15, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

h.  On February 22, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

i.  On March 1, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

j.  On March 8, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens for the presence of six uniformed officers at the Trump facilities.

k.  On March 15, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

l.  On March 22, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

m.  On March 29, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

n.  On April 5, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

o.  On April 12, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

p.  On April 19, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

q.  On April 26, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

r.  On May 3, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

s.  On May 10, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

t.  On May 17, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

u.  On May 24, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

v.  On May 31, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00 to Givens or his substitute for the presence of six uniformed officers at the Trump facilities.

w.  On June 7, 2014, Trump was obliged under this fraudulent pretext to pay
$1050.00 to Givens or his substitute for the presence of six uniformed officers at
the Trump facilities.

x.  On June 14, 2014, Trump was obliged under this fraudulent pretext to pay
$1050.00 to Givens or his substitute for the presence of six uniformed officers at
the Trump facilities.

y.  On June 21, 2014, Trump was obliged under this fraudulent pretext to pay
$1050.00 to Givens or his substitute for the presence of six uniformed officers at
the Trump facilities.

z.  On June 28, 2014, Trump was obliged under this fraudulent pretext to pay
$1050.00 to Givens or his substitute for the presence of six uniformed officers at
the Trump facilities.

aa. On July 5, 2014, Trump was obliged under this fraudulent pretext to pay $1050.00
to Givens or his substitute for the presence of six uniformed officers at the Trump
facilities.

31. From December 2013 until July 2014, Trump acquiesced, due to fear of reprobation, to
these fraudulent demands for payment by making direct payments to Givens or his substitute.
For each of these events, Trump also paid for their own security personnel, each of whom were
unaffiliated with the Sheriff's Office.

32. In total, from December 14, 2013 to July 5, 2014, Trump paid deputies of the Sussex
County Sheriff's Department $31,550.00.

33. Beginning in or around January 2014, Trump's management repeatedly asked Givens to
reduce the number of deputies that would work the events, especially the first Saturday of each

month when the attendance was regularly lower than normal. Givens on various occasion indicated that he would call Bell to get Bell's approval, and then called Trump's management back and report that Bell refused to allow Givens to reduce the number of deputies.

**Reducing the Capacity of the Facilities**

34. On or about January 25, 2014, Givens told Trump's management that, per the direction of Bell, the capacity of Trump's facilities would be henceforth reduced from the previously approved maximum of 624 duly established by the Virginia Department of Health to a new maximum of 400 people. The officers at the facilities enforced the reduction over Trump's protest by excluding approximately 100 people or more from entering the Trump facilities each night Trump facilities was open to the public from January 25, 2014 to July 5, 2014, costing Trump at least $60,000 in lost revenues.

35. The Defendants had no lawful authority to reduce or to establish unilaterally the capacity of a private business facilities.

**Meeting with Bell**

36. Trump's management repeatedly protested to Givens the increase in the rates for so-called security services, the enforcement of a reduced cap on the number of patrons in the facilities, Bell's and Given's refusal to reduce the number of deputies working nights where attendance was anticipated to be lower, and other things. Givens offered, and Trump's management accepted, a meeting with Bell to discuss these issues. Givens arranged the meeting. At this meeting, which Givens and Bell both attended with some of Trump's management, Bell indicated that he wanted to be continue to be a "partner" of Trump, and wanted Trump to be able to stay open, and therefore Trump needed to get along with Givens on these issues. Trump's management reasonably understood Bell's statements about wanting Trump to be able to stay

open as a veiled threat that he could have Trump closed if they did not cooperate with Givens and him.

37. Based on this meeting, Bell's statements, the previous statements of Givens, and the information available to Trump's management, including the reputation of Bell and Givens, Trump's management reasonably believed that as long as it remained open as a lounge, it had no option but to continue to pay the deputies on whatever terms Bell and Givens established, and refusal to do so would result in retribution, including suspension of licenses, interference in business activities, and ultimately being shut down.

**Trump Facilities Closed by Bell and Givens**

38. Prior to July 12, 2014, Trump excluded from its facilities those under the age of 21 years on nights it was open as a lounge. This was a decision of the management and not required by law. No federal, state, or local law, ordinance or regulation, including the ABC regulations, required Trump to exclude persons 18 to 20 years old from their facilities under the circumstances.

39. On July 12, 2014, Trump planned to hold an event open to patrons ages 18 and older, including college undergraduates on summer break from school. Prior to holding the event, Trump received clearance to do so from their agent with the Virginia Department of Alcoholic Beverage Control ("ABC"), as well as guidance on how to ensure that patrons under 21 are not served alcohol.

40. Per the approval and guidance of the ABC agent, Trump planned to have its security personnel at the doors of the facilities check each patron's photo identification. Security was to draw an X with a marker on the back of the hand of any patron under the age of 21, and issue

wrist bands only to those 21 and older. A person without a wristband or with an X on the hand would not be served alcohol.

41. On or about Thursday, July 10, 2014, Trump's management advised Bell by telephone that they were going to have the lounge open on July 12, 2014 to those eighteen years or older. Bell stated that they would not be permitted to do so. When Trump's management attempted to arrange a meeting with Bell to discuss this, Bell, by telephone, refused to meet with them, indicating that he already made his decision so there was no reason to meet, and that he would not allow Trump to be open to those under the age of twenty-one.

42. As Trump's management knew the Sheriff had no authority to prohibit them from holding Trump open to those eighteen to twenty years old, on July 12, 2014, Trump attempted to hold its facilities open to those eighteen years and older. At the direction of Bell and Givens, officers present at the scene, including Givens, refused to allow numerous eighteen- to twenty-year-old patrons into the facilities.

43. When Trump management asked Givens, who was on the scene and appeared to be giving directions, why the officers would not allow all who were over the age of 18 into the facilities, Givens failed or refused to answer, merely blocking the doors and insisting that Trump management was not to video-record the officers as they refused to allow the willing patrons ages eighteen to twenty from entering the facilities. Eventually, the officers began to refuse the admission to all willing patrons, regardless of age.

44. When one Trump's managers continued to demand Givens to provide an explanation, Givens used his cell phone to call Bell. Givens then gave the cell phone to this manager.

21

45. On this call, the manager was respectful and courteous to Bell. On this call, Bell was vulgar, irate, and abusive. Bell's slurred and irregular speech pattern and his statements gave the impression that Bell was intoxicated. On this call, Bell stated *inter alia*:

a. "Didn't I tell you we weren't going to let those 18-year-olds in there."

b. "Well, I'll tell you what I'm going to do, Posey [the last name of this manager's stepfather, which is not the manager's name], 'cause I'm tired of bothering with you. I'm going to Richmond on Monday and I'm going to have your license suspended." When asked why, Bell stated, "Because I talked to my Regional Director on Thursday, and I explained to him what I was trying to do. I explained to your partner what I was trying to do. You had a guy up there last week—three guys over there from North Carolina—with three guns trying to get in your club." This statement was inaccurate, as the three men were detained while in their parked car in the area of the facilities, not upon attempting to enter the club. Moreover, there was no alcohol involved in that situation, and Trump had no responsibility for these allegedly illegal actions of such third-parties. It had done nothing to encourage, authorize, participate in, or sanction such conduct.

c. "And, and, and, and, and, and, and, my thing is if you get – [be] quiet – if you get shot up and you're have [sic] some eighteen-year-old up there with alcohol and they're going to have him an accident [sic], I'm not going to be responsible."

d. "I'm going to call Freda [the aunt of another manager of Trump] right now." Freda has no control over, interest in, or relationship with Trump.

e. **"You know what, I'll tell you what I'm going to do. I'm going to come up and close your club down right now."** When asked why, Bell interrupted again,

saying, "Listen to this. You can't monitor eighteen-year-olds in a dark club. Someone go to the bar, buy them a drink, and go to the bathroom or go a dark spot of that club, and give them a drink."

f.  "Paul [the first name of one of the other managers of the club, not the one on the cell phone], I'm going to tell you right now, **you through. I'm through with you.**"

g.  "I'm going to call Earl [Cross, owner of Earl Cross Holding Inc., the lessor of Trump's facilities] right now. I'm going to collapse [or lapse] your lease. I'm going to call the Regional Director [of the Virginia ABC] 'cause I got his number from Fluvana on my speed—on my speed phone, and I'm going to ask him to send your ABC agent to Sussex right now, and **I'm going to close you down.**"

h.  "No. No. No. No. No. I'll tell you and your daddy Posey [the manager's stepfather, a sergeant with the Virginia State Police, who is entirely unaffiliated with Trump] with that bullshit [sic]. Cause y'all don't care. Y'all about making money. Y'all don't care about people's lives. **I don't give a damn about that. I got an election to run next year. You all are not going to sabotage my shit…**"

i.  "You got Posey being a state police. He can't—he can't dictate shit to me." (Bell appeared to be under the erroneous impression that Posey was someone involved in Trump's decision to lawfully hold its business open to eighteen- to twenty-year-olds, and that this constituted a challenge to Bell's authority.)

j.  "I'm a sheriff, an elected official, **I have more power than Posey will have in his lifetime. And I'm telling you right now, there are no eighteen-year-olds**

**coming into that club tonight, and if they do, I'll come up there and close the whole damn club down. Do you understand that."**

k. "No. No. No. No. You're not telling me anything. I'm telling you."

l. When Trump's manager asked if he could ask a question, the response was, "No. No. No. No. Number one, you should have met with me if you wanted to do this crap. You just decided that you want to do it, and Posey went behind my back. And I saved his ass on three occasions from getting fired from the state police. And here you go with that bullshit of you and Posey going down and imposing [sic] that I went down and asked you for money. I ain't asked you for a Goddamned thing. Because you know what, I've haven't been to your club, and I don't give a *fuck* about that club, so I'll be *damned* if I'll allow you to dictate to me that—the Sheriff of Sussex County—on what you're going to do. **There are no 18-year-olds coming into that club tonight, and if they do, I'm—I'm going to get Ryant Washington** [Govern McAuliffe's appointee as special policy adviser on law enforcement to the state Department of Alcoholic Beverage Control, the former Sheriff of Fluvanna County, who Bell appeared to be calling the "regional director"], **I'm going to make him come from Fluvanna, and I'm going to get another down from Hampton, and I'm going to take your license off the Goddamned wall tonight."**

m. When Trump management reiterated that its ABC agent told them that they had the option to have Trump open to those 18-years-old or older, Bell said, "He can't tell you what. I talked to the regional director, which is Ryant—Ryant Washington." (Ryant Washington is not an ABC regional director.).

24

n. "You can't dictate what hands the liquor's going, son [sic]. If you on the damn phone [sic] and they in the dark corners and in the bathroom and everywhere else and someone else's kid try to get killed tonight for drinking underage alcohol [sic], it comes back to Raymond Bell. It doesn't come back to you, 'cause you ain't nobody. You just a club person."

o. "I'm going to call Freda right now, and I'm going to come down and meet with her and **I'm going to close your Goddamned club down tonight. I'm fed up with you. I'll be damned if you going to dictate to me what the fuck you're going to do in my Goddamned county. It ain't your county. It ain't Paul's county. Paul don't have a county.**"

46. At that point, Lieutenant Givens took the phone and asked Bell, "What do you want us to do?"

47. After this call, Bell drove to Trump and he, Givens, and at least five uniformed deputies of the Sheriff's Office entered Trump's facilities and under color of law demanded and directed all the patrons to immediately leave the facilities and go home, including with threats of arrest from Bell himself, and further demanded that Trump refund the cover charge to patrons. Bell and the deputies blocked the entrance to the business and told the nearly 200 people waiting to enter to leave the property. Bell appeared to be intoxicated.

48. Several of the patrons stated their intent not to return to Trump again due to the incident.

49. After dismissing the patrons from the facilities, Bell said to Trump's managers, "Shut-up and let me tell you what I'm going to do. Because you going through your daddy, Posey, who a trooper [sic]. Oh, Posey's your daddy? Okay. . . . **I'm fed up with you all. I called the regional director of the ABC Board just now and woke him up out of his bed, and he's not very**

happy about this. I'm going to revoke your license as of Monday. And I've called Earl
[Cross, Trump's landlord] a few minutes ago. Your contract here has not been extended. I
want you out—I want you out—no, I want you out of here this week. Out of my county.
Because you know what? You have this thug mentality."

50. After clearing Trump of its patrons, Bell demanded that Trump's management, including
Nelson, pay him $35 an hour for each deputy who helped close down the business.

51. After getting this money, Bell threatened one of Trump's managers with arrest, ordering
the man to put his hands behind his back and ordering his deputies to put the manager in
handcuffs, asserting that Trump had not paid a deputy the full amount he was due from a prior
night, an amount that Trump had disputed as it involved time spent at the jail after Trump closed,
booking a person who had been arrested. Cf. Va. Code § 2.2-3103(1). To avoid this threatened
arrest, Trump paid the disputed charge.

52. Trump lost at least four-thousand dollars ($4,000.00) in revenue on July 12, 2014 as a
result of Bell and his deputies' actions in unlawfully closing the business.

53. Due to the reasonable fear of arrest inspired by the Defendants' actions, Trump did not
reopen at any date after July 12, 2014. In fact, it later surrendered its alcohol license (which had
not officially been revoked by the ABC or the Sheriff, and which was not in the process of being
revoked through the administrative channels) because it closed the facilities licensed to serve
alcohol.

54. To date, Trump has lost at least $212,800 in revenue due to this unlawful closing of its
business.

55. As Trump remained under lease with Cross despite the Defendants' actions, Trump lost $3,150 in lost use of the establishment as reflected in lease payments made to Cross in July 2014 and for August 2014.

56. At no time was Trump or its employees charged criminally with any violation in connection with Trump's business, as there was no probable cause to believe that Trump or its employees had ever committed any violation meriting criminal charges. Even on the night the Defendants closed down the Trump facilities, Trump and its agents or employees were not charged criminally. This is evidenced by the lack of any criminal or noncriminal report of the incident in Exhibit H.

57. At no time was any administrative or civil action commenced against Trump or its management in connection with the events of July 12, 2014, as there was no basis for any administrative or civil action.

**The Law and Standing Orders Concerning Off-Duty Employment of Deputies**

58. The conduct of Bell, Givens and the deputies concerning the provision of security services, while done under the color of law, was inconsistent with a local ordinance and a standing order of the Sheriff under that ordinances.

59. Virginia Code § 15.2-1712 provides: "Notwithstanding the provisions of §§ 2.2-3100 through 2.2-3127, any locality may adopt an ordinance which permits law-enforcement officers and deputy sheriffs in such locality to engage in off-duty employment which may occasionally require the use of their police powers in the performance of such employment. Such ordinance may include reasonable rules to apply to such off-duty employment, or it may delegate the promulgation of such reasonable rules to the chief of the respective police departments or the sheriff of the county or city."

60. Additionally, Virginia Code § 9.1-139 to -140 requires those, such as the deputies, engaged in a private security services business, to be licensed, exempting the deputies only if they are "receiving compensation for *private employment* as a security officer, or receiving compensation *under the terms of a contract, express or implied*, as a security officer" (emphasis added).

61. Under the Sussex County Ordinance § 2-3, established in 1991 and continuing in effect through July 2014, off-duty deputies (defined as those times when he is not "carrying out an assigned duty or function of his office") may only be employed with certain types of organizations, namely volunteer fire departments, rescue squads, or their auxiliary units; organizations operated exclusively for religious, charitable, community, or educational purposes; association of war veterans or auxiliary units thereof in the United States; and fraternal associations operating under the lodge system. Compensation for such services is to be paid directly to the County. The ordinance further states: "The sheriff shall promulgate such reasonable rules and regulations to apply to such off-duty employment." A copy of the ordinance is provided as Exhibit E.

62. The Sussex County Sheriff's Office had a General Order, see attached Exhibit F, revised October 11, 1998 and apparently in effect through January 31, 2014, concerning off-duty employment of Deputies.

        a.  Contrary to the ordinance, this Order states, "The Sheriff will determine whether the off-duty employer will pay the deputy directly or the Sheriff's Office will bill the employer."

        b.  The General Order also provides, "If the deputy is paid directly the normal withholdings must be deducted from his/her paycheck."

c. The General Order provides, "Deputies will not be allowed to work security at any bars . . . ."

d. The General Order provides, "The normal rate of pay for all deputies is $20.00 per hour," and "The rate of pay when working for outside employers can be negotiated, but must be approved by the Sheriff."

63. The Sussex County Sheriff's Office now has General Order RR 1-11, see attached Exhibit F, concerning off-duty employment, apparently effective February 1, 2014 to at least July 13, 2014:

a. This Order asserts that "the Sheriff shall manage according to whatever reasonable controls he deems necessary to restrict [sic] or regulate the conduct of employees.

b. The Order asserts, "The salary required for officers employed in a law enforcement-related off-duty capacity shall be $35 per hour. This rate of pay is for off duty security only."

c. The Order asserts, "Any off-duty assignment made through the Sheriff's Office will be assigned by the supervisor appointed by the Sheriff to handle off-duty request [sic]."

d. "Deputies, while engaged in law enforcement-related employment, shall be subject to the orders of the on-duty law enforcement supervisor."

64. Contrary to the ordinance and the Order in effect until January 31, 2014, deputies provided so-called security services at Trump. Trump does not fall within the category of permitted sponsoring organizations under the ordinance. Moreover, Trump constitutes a bar, and the General Order in effect until January 31, 2014 prohibits service at a bar.

65. Contrary to the ordinance, which requires payments to be made directly to the County, and the first General Order which indicates the Sheriff's Office may bill for such services, Givens demanded that payment be made in cash to him on the night the services were rendered, without documenting the payments.

66. In violation with the first General Order and federal law, the officers obstructed Trump's ability to withhold appropriate taxes from the payments or to report the payments to taxing authorities.

67. Contrary to the first General Order and the ordinance, Trump was not permitted to negotiate a salary with the individual officers, but rather the salary was mandated by Bell and/or Givens.

68. Based on the conduct of Givens and Bell, described herein (especially Givens's fraudulent misrepresentation that the law required Trump to maintained paid deputies as security, Givens's and Bell's refusal to limit the number of deputies present at Trump, and Givens's and Bell's use of the deputies to impose unlawful regulations on Trump over Trump's protest) and the General Orders in place, the deputies:

   a.   were not at-will or term employees of Trump;

   b.   were not engaged in "off-duty employment" per Virginia Code § 15.2-1712;

   c.   were not engaged in "private employment" per Virginia Code § 9.1-140;

   d.   were not employed under a "contract, express or implied," per Virginia Code § 9.1-140.

69. In the course of pre-litigation investigation of these claims, counsel for Plaintiff submitted a request for information under the Virginia Freedom of Information Act to the Sheriff, the County Attorney for Sussex, and the Board of Supervisors. See Exhibits G (FOIA

request). The Sheriff's Office responded to this requests by letters dated August 18, 2014 (Exhibit H). Additionally, the County Attorney confirmed by email dated September 11, 2014 (Exhibit I), that apart from the official salary of, allowances of, and reimbursements to Bell, the County had no additional records other than those provided by the Sheriff's office responsive to the FOIA requests.

70. This FOIA request and response, with the other Exhibits, establish:

    a. There was not criminal incident information (as that term is defined under Virginia Code § 2.2-3706[1]) connected to the Trump facilities for July 12, 2014, as there was no reported criminal incident on that night. (Request # 1 and attached documents.)

    b. There was not record of a non-criminal incident (as that term is defined under Virginia Code § 15.2-1722[2]) connected to the Trump facilities for July 12, 2014, as there was no reported criminal incident on that night. (Request # 2 and attached documents).

    c. There are no County or Office policies, procedures, ordinances, or regulations concerning the sale or distribution of alcohol in Sussex County in effect in July 2014. (Request # 5.)

    d. The Sheriff has no record of policies, procedures, ordinances, or regulations authorizing him to issue or revoke permits or licenses in July 2014. (Request # 7).

---

[1] Criminal incident information. . . shall include:
(1) A general description of the criminal activity reported;
(2) The date the alleged crime was committed;
(3) The general location where the alleged crime was committed;
(4) The identity of the investigating officer or other point of contact; and
(5) A general description of any injuries suffered or property damaged or stolen.

[2] "Noncriminal incidents records" means compilations of noncriminal occurrences of general interest to law-enforcement agencies, such as missing persons, lost and found property, suicides and accidental deaths.

e. There are no records of payments being made by Trump or it proprietors to Sussex County or its employees or Sussex County Sheriff's Office or its employees. (Request # 8.)

f. The Sheriff's Office has no contracts on file between Plaintiff and either Sussex County, Sussex County Sheriff's Office, or Bell for security or any other purpose. (Request # 9.) (Indeed, no such contract exists or ever existed.)

**Improper Motive**

71. As evidenced by the FOIA requests and responses, specifically the requests for criminal incident information and the request for records of any noncriminal incident, the Sheriff's Office did not treat Trump's conduct that night as a criminal incident, and did not create any record of it as a noncriminal incident.

72. It appears Defendants were operating similar activities at other local businesses, as the August 18 FOIA response of the Sheriff (Exhibit H) apparently inadvertently provided a copy of a January 3, 2014 on official letter signed by Bell as Sheriff to **"Young Men's Social Club"** stating, "This is to notify you that effective January 1, 2014 the hourly rate for security at club events is increased to $35.00 per hour per deputy." Moreover, Earl Cross indicated that the deputies acted similarly with respect to the prior business at that location. Moreover, the facilities has since been rented to another business, and Givens and other deputies provided security at this business.

**Damages**

73. Having reasonable fear based Bell's threats of arrest, Trump's management closed the business and surrendered Trump's ABC license.

32

74. As a result of Defendant's conduct, as itemized in the preceding paragraphs, Trump has lost at least $311,500.00 in anticipated profits and in unrecovered capital investment losses to date, not including other damages it actually suffered, including damage to its good will and damage to its operation as a going concern, and future lost revenues.

75. The Sheriff's Office acknowledges that no policies, procedures, ordinances, or regulation of Sussex County, the Sheriff's Office, or the Commonwealth, authorized Bell or the Sheriff's Office to issue or revoke permits or licenses in Sussex County.  See Exhibits G to I (FOIA request and response).

## CLAIMS FOR RELIEF

### COUNT I
### (Violation of the Amendment XIV of U.S. Constitution, made actionable pursuant to 42 U.S.C. § 1983)

76.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference and incorporation as if fully set forth herein.

77.    The Defendants' conduct of demanding and/or receiving payments of U.S. currency under color of law (including letters on official Sheriff' Office letterhead endorsed by the Sheriff and knowingly fraudulent misrepresentations that such payments are required under local ordinances), without legal justification, in violation of ordinances and state law, deprived the Plaintiff of liberty and property without due process, in violation of Section I of the Fourteenth Amendment to the Constitution of the United States.

78.    The Defendants' and co-conspirators' conduct of demanding and receiving payments of U.S. currency was action under color of law and not conduct of the individual officers being voluntarily employed during off-duty hours by Trump in a private capacity, as evidenced *inter alia* by the letter of the Sheriff establishing rates for those services, the lack of control Trump

33

had over the Defendants, Given's reliance on the decisions of the Bell, Given's misleading representations of the local law, Bell's conduct at the meeting with Trump's management, and the ordinance and General Orders in place.

79.     The Defendants' deprivations of liberty and property through the fraudulent and extortive acts described herein fall so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency, as they were, *inter alia*, so unjustified by any circumstance or governmental interest, as to be incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.

80.     Defendants' actions were designed to and did preclude pre- and post-deprivation remedies for the deprivation of liberty and property.

81.     Defendants acted intentionally and with knowing and reckless disregard of Trump's constitutional rights, as evidenced by the facts alleged herein.

82.     This conduct of demanding and receiving payments of U.S. currency under color of law for so-called security services without legal justification damaged Trump to the amount of at least $31,500 in payments made to the deputies by Trump from December 2013 to July 2014.

        WHEREFORE Plaintiff, TRUMP TIGHT, LLC, respectfully requests that this Court enter judgment against Defendants and hold each Defendant jointly and severally liable to Plaintiff for the sum of $31,500.00 in compensatory damages, $100,000.00 in punitive damages, prejudgment and post judgment interest, reasonable attorney's fees pursuant to 42 U.S.C § 1988(b), costs, and any additional relief as the court may deem appropriate.

## COUNT II
**(Violation of the Amendment XIV of U.S. Constitution, made actionable pursuant to 42 U.S.C. § 1983)**

83.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference and incorporation as if fully set forth herein.

84.     Plaintiff's exercise of control over Trump by *inter alia* restricting willing would-be patrons from entering the facilities, without legal justification, and imposing unlawful limits on the number of patrons that they would permit to enter the facilities, without legal justification, deprived Trump of liberty and property in violation of the Fourteenth Amendment of the Constitution of the United States.

85.     The Defendants' conduct of restricting willing would-be patrons from entering the facilities was not conduct of the individual officers being voluntarily employed by Trump in a private capacity, but was instead enforcement of the unlawful directive established by Bell and Givens.

86.     The Defendants' deprivations of liberty and property through the fraudulent and extortive acts described herein fall so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency, as they were, *inter alia*, so unjustified by any circumstance or governmental interest, as to be incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.

87.     Defendants' actions were designed to and did preclude pre- and post-deprivation remedies for the deprivation of liberty and property.

88.     Defendants acted intentionally and with knowing and reckless disregard of Trump's constitutional rights, as evidenced by the facts alleged herein.

89.     This conduct of exercising of control over Trump by *inter alia* restricting willing would-be patrons from entering the facilities, without legal justification, and imposing unlawful limits on the number of patrons that they would permit to enter the facilities, without legal justification, deprived Trump of liberty and property in violation of the Fourteenth Amendment of the Constitution of the United States, and damaged Trump to the amount of $60,000.00 in lost revenues.

WHEREFORE Plaintiff, TRUMP TIGHT, LLC, respectfully requests that this Court enter judgment against Defendants and hold each Defendant jointly and severally liable to Plaintiff for the sum of $60,000.00 in compensatory damages, $180,000.00 in punitive damages, prejudgment and post judgment interest, reasonable attorney's fees pursuant to 42 U.S.C § 1988(b), costs, and any additional relief as the court may deem appropriate.

## COUNT III
### (Violation of the Amendment XIV of U.S. Constitution, made actionable pursuant to 42 U.S.C. § 1983)

90.     Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference and incorporation as if fully set forth herein.

91.     Plaintiff's held as property *inter alia* its licenses to do business (including its alcohol license[3]), a lease of the facilities, its trademark and other intellectual property, its reputation and goodwill, its inventory and equipment, cash on hand, and its ongoing business concern. Under state law, the licenses could only be suspended or revoked upon a showing of cause and with due process. Virginia Code § 4.1-227 to -229.

92.     On July 12, 2014, the Defendants collaborated in depriving Trump of its property and liberty without due process and without lawful justification *inter alia* by:

---

[3] Ruttenberg v. Jones, 283 Fed. Appx. 121, 129 (4th Cir. 2008); Bell v. Burson, 402 U.S. 535, 29 L. Ed. 2d 90, 91 S. Ct. 1586 (1971).

   i.  blocking the admission of prospective patrons from the club, over the objections of Trump's managers;

  ii.  attempts to intimidate and berate the management of Trump;

 iii.  using prospective threats that they would

      1.  immediately shut down the business without pre- or post-seizure judicial or administrative remedies,

      2.  contact the ABC agents and get them to assist in immediately shutting down the business,

      3.  immediately revoke the business's ABC license,

      4.  report to the family members of Trump's managers the managers' disobedience of the Sheriff's directions, and

      5.  contact the lessor of Trump's facilities to get him to lapse the lease;

 iv.  entering the facilities in force and expelling patrons from the facilities under color of law, and directing would-be patrons to go home, including with threats of arrest, and by directing Trump's management to reimburse patrons the cover charge;

  v.  contacting, or representing that they contacted, an agent of the ABC, who supported their actions;

 vi.  by contacting, or representing that they contacted, the lessor of Trump's facilities and directing or intimidating him into not renewing the lease or in terminating the lease;

      vii.   stating, under color of law and with implicit threats of reprisals, but without lawful justification or support, that Trump's ABC license was revoked as of July 14, 2014;

     viii.   directing, under color of law and with implicit threats of reprisals, but without lawful justification or support, that Trump's management was not to reopen the business; and

      ix.   directing, under color of law and with implicit threats of reprisals, but without lawful justification or support, that Trump and its management was to leave the county within the week of July 12, 2014.

93.     Defendants had actual knowledge on July 12, 2014 that Trump had policies and practices in place and actively being enforced to ensure that those under the age of 21 were not served alcohol.

94.     Defendants had no probable cause to believe on July 12, 2014 that Trump or its employees had served alcohol to anyone under the age of 21, or had violated the law in any other way. Their actions were not premised on a belief that Trump or its employees had served alcohol to anyone under the age of 21.

95.     Defendants did not have probable cause to believe on July 12, 2014 that anyone under the age of 21 consumed alcohol at the Trump facilities, as evidenced by the failure to issue any criminal charges and by the FOIA response showing no record of a criminal incident at that location on that day. Their actions were not premised on a belief that anyone under the age of 21 consumed alcohol at the Trump facilities.

96.   Defendants had no lawful justification for their conduct, and provided to no pre- or post-seizure recourse, but instead employed threats of further retribution if Trump tried to continue its business at that location.

97.   The stated motive for this unconstitutional interference with a lawful and duly licensed business was not the enforcement of law. Plaintiffs were never charged with a violation of law, and Defendants never stated that Plaintiffs were violating a law. Rather, the stated motive was Bell's fear of public criticism and unpopularity and that he would not be re-elected as Sheriff. Moreover, it was motivated by his desire for control in the community and being "fed up" with Trump's refusal to obey his dictates. At best, he acted on the speculative and unfounded prospect that a crime might occur in the future through.

98.   While the Sheriff Office's FOIA response claims to operate pursuant to ABC regulations in matters concerning alcohol, Virginia Code § 4.1-227 to -229 governs suspension of licenses and clearly do not permit summary suspension or revocation of licenses by local sheriffs.

99.   The Defendants' actions falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency, as they were, *inter alia*, so unjustified by any circumstance or governmental interest, as to be incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.

100.   Defendants' actions were designed to and did preclude pre- and post-deprivation remedies, especially as no criminal charges were issued.

101.   Defendants acted intentionally and with knowing and a reckless or callous disregard of or indifference to Trump's constitutional rights.

102.   As a result of this unconstitutional conduct of the Defendants, Plaintiff has suffered damages in excess of $216,000.00 in lost revenue to date.

103.   As a result of this unconstitutional conduct of the Defendants, Plaintiff has suffered additional and anticipated losses in excess of $2,284,000.00.

WHEREFORE Plaintiff, TRUMP TIGHT, LLC, respectfully requests that this Court enter judgment against Defendants and hold each Defendant jointly and severally liable to Plaintiff for the sum of $2,500,000.00 in compensatory damages, $7,500,000.00 in punitive damages, prejudgment and post judgment interest, reasonable attorney's fees pursuant to 42 U.S.C § 1988(b), costs, and any additional relief as the court may deem appropriate.

## COUNT IV
### (Violation of the Amendment IV of U.S. Constitution, made applicable to the states under Amendment XIV and made actionable pursuant to 42 U.S.C. § 1983)

104.   Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference and incorporation as if fully set forth herein.

105.   On July 12, 2014, Defendants with others unlawfully entered into seized the Trump facilities without warrant or probable cause to believe a crime had been committed, and without an applicable exception to the warrant requirement, under color of law, ejecting patrons of Trump from the facilities and excluding other would-be patrons from entering the facilities, and by compelling Trump to reimburse cover charges.

106.   Trump held property rights to the facilities, which were private property, under a lease agreement with the owner, and was duly licensed and authorized to conduct its business in the facilities.

107.   The Defendants continued this seizure by threatening the Trump's management with arrest and other retributive actions if it restarted its lawful business on another night, even

ordering them to leave the county. Based upon these threats, in which Trump's management reasonably believed, Trump did not reopen the establishment after July 12, 2014.

108.   Defendants acted intentionally and with knowing and a reckless or callous disregard of or indifference to Trump's constitutional rights.

109.   As a result of this unconstitutional conduct of the Defendants, Plaintiff has suffered damages in excess of $216,000.00 in lost revenue to date.

110.   As a result of this unconstitutional conduct of the Defendants, Plaintiff has suffered additional and anticipated losses in excess of $2,284,000.00.

WHEREFORE Plaintiff, TRUMP TIGHT, LLC, respectfully requests that this Court enter judgment against Defendants and hold each Defendant jointly and severally liable to Plaintiff for the sum of $2,500,000.00, in compensatory damages, $7,500,000.00 in punitive damages, prejudgment and post judgment interest, reasonable attorney's fees pursuant to 42 U.S.C § 1988(b), costs, and any additional relief as the court may deem appropriate.

## COUNT V
### (Violation of the Amendment XIV of U.S. Constitution, made actionable pursuant to 42 U.S.C. § 1983)

111.   Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference and incorporation as if fully set forth herein.

112.   Upon information and belief, Plaintiff was for all relevant purposes similarly situated with a number of bars, restaurants and other businesses or establishments possessing an ABC license for serving alcohol to the public.  Upon information and belief, the Defendants treated Plaintiff differently than some of these similarly situated bars, restaurants and other businesses or establishments possessing an ABC license for serving alcohol to the public. Specifically, *inter alia*, upon information and belief, Defendants do not require, with fraudulent representations of

41

the requirements of local law, such establishments to pay for the presence of law enforcement officers while alcohol is being served, though they did so with Trump.

113. Upon information and belief, Plaintiff was for all relevant purposes similarly situated with a number of bars, restaurants and other businesses or establishments possessing an ABC license for serving alcohol to the public. Upon information and belief, the Defendants treated Plaintiff differently than some of these similarly situated bars, restaurants and other businesses or establishments possessing an ABC license for serving alcohol to the public. Specifically, *inter alia*, upon information and belief, Defendants do not require, with fraudulent representations of the requirements of local law, such establishments to pay for the presence of law enforcement officers while alcohol is being served, though they did so with Trump.

114. Upon information and belief, Plaintiff was for all relevant purposes similarly situated with a number of bars, restaurants and other businesses or establishments possessing a license from the Virginia Department of Health establishing a maximum occupancy limit. Upon information and belief, the Defendants treated Plaintiff differently than some of these similarly situated bars, restaurants and other businesses or establishments possessing a license from the Virginia Department of Health establishing a maximum occupancy limit. Specifically, *inter alia*, upon information and belief, Defendants do not arbitrarily reduce the occupancy limit for some of the other such establishments.

115. Upon information and belief, Plaintiff was for all relevant purposes similarly situated with a number of bars, restaurants and other businesses or establishments possessing an ABC license for serving alcohol to the public that permit individuals ages eighteen to twenty years old or younger to frequent the facilities during times when alcohol is being served to those customers, guests, or members who are twenty-one and older. Upon information and belief, the

42

Defendants treated Plaintiff differently than some of these similarly situated bars, restaurants and other businesses or establishments possessing an ABC license for serving alcohol to the public that permit individuals ages eighteen to twenty years old or younger to frequent the facilities during times when alcohol is being served to those customers, guests, or members who are twenty-one and older. Specifically, *inter alia*, upon information and belief:

a. Defendants did not and do not exercise their apparent authority under color of law enter preclude willing patrons under the age of twenty-one or otherwise from entering such establishments held open to them by the private owners, though they did so to Trump;

b. Defendants did not and do not threaten to shut down such establishments for permitting such individuals from being present while alcohol is being served, though they did so to Trump;

c. Defendants did not and do not appear with uniformed deputies to expel patrons from the facilities when the facilities permit individuals ages eighteen to twenty or younger to be present in the facilities while alcohol is being served to individuals who are twenty-one or older, much less demand payment for the deputies that shut down the facilities, though they did so to Trump;

d. Defendants did not and do not threaten to revoke the ABC license of such facilities, though they did so to Trump;

e. Defendants did not and do not state that the ABC license of such facilities is revoked, though they did so to Trump;

f. Defendants did not and do not call, or state that they did call, the landlord of the facilities to interfere with the lease of such facilities, though they did so to Trump;

43

      g.  Defendants did not and do not order the management of such facilities to leave the county, though they did so to Trump.

116.  Upon information and belief, Plaintiff was for all relevant purposes similarly situated with a number of businesses that had a legitimate dispute with an individual it was paying on an hourly basis concerning the number or compensable hours. Upon information and belief, Defendants treated Trump differently than these similarly situated businesses by threatening Trump's management with arrest if it failed to pay a disputed sum.

117.  This disparity of treatment between Trump and such similarly situated individuals was done intentionally and under color of law, albeit in violation of the law, but this disparity of treatment was not rationally related to any legitimate governmental objective, and indeed was prohibited under the law and/or defendants otherwise lack legal authority or discretion to act as they did. As such, Defendants' conduct deprived Trump of the equal protection of the law in violation of the Fourteenth Amendment to the Constitution of the United States.

118.  In denying the Plaintiff the equal protection of the laws, Defendants acted intentionally and with knowing and a reckless or callous disregard of or indifference to Trump's constitutional rights

119.  As a result of this unconstitutional conduct of the Defendants, Plaintiff has suffered damages in excess of $2,500,000.00.

WHEREFORE Plaintiff, TRUMP TIGHT, LLC, respectfully requests that this Court enter judgment against Defendants and hold each Defendant jointly and severally liable to Plaintiff for the sum of $2,500,000.00, in compensatory damages, $7,500,000.00 in punitive damages, prejudgment and post judgment interest, reasonable attorney's fees pursuant to 42 U.S.C § 1988(b), costs, and any additional relief as the court may deem appropriate.

## COUNT VI
### (Violation of the Va. Code § 18.2-499 and -500)

120.    Plaintiff repeats and re-alleges the allegations set forth in the preceding paragraphs of the Complaint by reference and incorporation as if fully set forth herein.

121.    Defendants combined, associated, agreed, mutually undertook, and/or concerted together and/or with others, or attempted to do the same, for the purpose of willfully, purposefully, intentionally, and without lawful justification injuring Trump and its business, causing actual damages, in violation of Va. Code § 18.2-499(a) and/or (b).

122.    This actual or attempted combination, association, agreement, mutually undertaking, and/or concerted action consisted of one or more of the following persons and actions and extended to all of the conduct described in this complaint, including *inter alia*:

    a.    Bell and Givens co-managing an unincorporated, private association of off-duty (if they were off-duty) deputies using their positions for the private benefit of Givens and the deputies, as well as Bell at least indirectly, by requiring Trump to pay untaxed, above-market rates for so-called security services provided by the deputies and Givens under fraudulent representations of the requirements of local ordinances or laws, the apparent authority of Bell and Givens, implicit threats of retaliation for failure to comply, and the other actions complained of in this Complaint. While Givens managed the day-to-day operations and receipt of payments, he relied upon Bell and Bell's apparent authority to obtain or ensure higher payments per deputy, more deputies than necessary on slow nights, payments for time spent in the exercise of police powers after the normal hours paid by Trump, possibly the availability of the deputies of choice, and to continue the fraud that Trump was required to have the deputies present and pay them for

45

their time. Bell personally benefited from this arrangement, if not directly through a portion of the payments as Givens did, then indirectly by improving the morale and loyalty of select deputies who were then willing to support Bell's conduct in the community and enforce unlawful directives so as to allow Bell to maintain his office and exercise unlawful control over local business and politics.

b. Bell and Givens, together with the deputies who assisted them, establishing and enforcing by color of law regulations on Trump's business that were not valid under the law, including but not limited to the number of persons permitted to be in the facilities at one time. Upon information and belief, these actions were motivated in part by self-interest, namely demonstrating Bell's and Givens' power over Trump so as to help ensure compliance in any future demands, regardless of the legal legitimacy of the demand.

c. Bell and Givens, together with the deputies who assisted them, in enforcing an unlawful directive of Bell in shutting down Trump's facilities on July 12, 2014, without probable cause to believe Trump or its employees or manager had committed a crime, and without lawful justification, and to further intimidate Trump's management into not reopening the facilities, for the express purposes of helping to ensure that Bell does not lose the 2015 election for his office, as retaliation against Trump for not following Bell's prior lawless directions not to open the lounge to eighteen- to twenty-year-olds, and because Bell believed Posey and Trump were challenging his authority within "his county," and possibly to replace Trump with a business more willing to comply with the demands of Bell and Givens and/or make payments to them. In fact, the facilities previously leased

by Trump have been leased to a new business, Empire Restaurant and Lounge, operating a bar and lounge at that location, upon information and belief with the deputies and Givens serving as paid security.

d. Bell and Ryant Washington, inasmuch as Bell admitted that he had called Ryant Washington on July 12, 2014 and used this call as a basis for intimidating Trump's management to permanently close the facility. The purpose of this action was to further intimidate Trump's management into not reopening the facilities, for the express purposes of helping to ensure that Bell does not lose the 2015 election for his office, as retaliation against Trump for not following Bell's prior lawless directions not to open the lounge to eighteen- to twenty-year-olds, and because Bell believed Posey and Trump were challenging his authority within "his county," and possibly to replace Trump with a business more willing to comply with the demands of Bell and Givens and/or make payments to them. In fact, the facilities previously leased by Trump have been leased to a new business, Empire Restaurant and Lounge, operating a bar and lounge at that location, upon information and belief with the deputies and Givens serving as paid security.

e. Bell and Earl Cross and Earl Cross Holdings, Inc., inasmuch as Bell admitted that he had called Earl Cross on July 12, 2014, who Bell asserted agreed not to extend the lease of the facilities to Trump, and Bell used this call as a basis for intimidating Trump's management to permanently close the facility. [4] The

---

[4] Regardless of whether Ryant Washington or Earl Cross really cared about the situation, these allegations are plausible given Bell's statements that these calls took place. Bell's stated purpose in making these calls was to induce Ryant Washington to join with Bell in taking concerted action against Trump and to induce Earl Cross to terminate or refuse to extend the lease of the facilities. Bell then used these calls as threats of concerted action as a means of intimidating Trump's management. At the very least, this is a violation of Virginia Code § 18.2-499(b), and civil suit is permitted under Virginia Code § 18.2-500.

purpose of this action was to further intimidate Trump's management into not reopening the facilities, for the express purposes of helping to ensure that Bell does not lose the 2015 election for his office, as retaliation against Trump for not following Bell's prior lawless directions not to open the lounge to eighteen- to twenty-year-olds, and because Bell believed Posey and Trump were challenging his authority within "his county," and possibly to replace Trump with a business more willing to comply with the demands of Bell and Givens and/or make payments to them. In fact, the facilities previously leased by Trump have been leased to a new business, Empire Restaurant and Lounge, operating a bar and lounge at that location, upon information and belief with the deputies and Givens serving as paid security.

123.   As a result of Defendant's conduct, as itemized in the preceding paragraphs, Trump has suffered losses in anticipated profits and in unrecovered capital investment losses, in addition to other damages it actually suffered, including damage to its good will and damage to its operation as a going concern in an amount exceeding $2,500,000.00.

WHEREFORE Plaintiff, TRUMP TIGHT, LLC, respectfully requests that this Court enter judgment against Defendants and hold each Defendant jointly and severally liable to Plaintiff for the sum of $7,250,000.00 in treble compensatory damages, prejudgment and post judgment interest, reasonable attorney's fees pursuant to Virginia Code § 18.2-500, costs, and any additional relief as the court may deem appropriate.

**TRIAL BY JURY REQUESTED.**

Respectfully submitted,
TRUMP TIGHT, LLC

By: /s/ Andrew T. Bodoh
        Counsel

Thomas H. Roberts, Esq. (VSB 26014)
tom.roberts@robertslaw.org
Andrew T. Bodoh, Esq. (VSB 80143)
andrew.bodoh@robertslaw.org
THOMAS H. ROBERTS & ASSOCIATES, P.C.
105 South 1st Street
Richmond, Virginia 23219
Tel: 804-783-2000
Fax: 804-783-21058
*Counsel for Plaintiff*