IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TRUMP TIGHT, LLC,
                Plaintiff,

v.                                        Civil Case No. 3:15-cv-00175-JAG

RAYMOND R. BELL and
VINCENT B. GIVENS,
                Defendants.

## OPINION

Trump Tight, LLC ("Trump"),[1] opened a restaurant and lounge in Sussex County, Virginia, and, until its closing, butted heads with Sheriff Raymond R. Bell. During Trump's short-lived tenure in Sussex County, Sheriff Bell—through his deputies, including Lieutenant Vincent B. Givens—allegedly forced Trump to hire and pay off-duty uniformed deputies as security, decreased the maximum occupancy limit, refused to let Trump open to underage patrons, and, ultimately, shut Trump's facility down. Trump sued Bell and Givens, alleging multiple constitutional claims and one state law claim. The defendants now move to dismiss the case for failure to state a claim. Because qualified immunity protects Bell and Givens, the Court grants the defendants' motions to dismiss the constitutional claims. Without these federal claims, the Court declines to exercise jurisdiction over the remaining state law claim, dismissing this claim without prejudice.

---

[1] The defendants argue that Trump lacks standing because the State Corporation Commission ("SCC") automatically cancelled "Trump Tight LLC" for failure to pay its fee on October 31, 2014. (Bell's Mot. 1.) The SCC reinstated "Trump Tight LLC" on October 19, 2015. (Trump's Resp. to Bell's Mot. Ex. 1.) Under Virginia law, "[u]pon entry of the order [of reinstatement], the existence of the limited liability company shall be deemed to have continued from the date of the cancellation as if cancellation had never occurred." Va. Code Ann. § 13.1-1050.4. Accordingly, Trump has standing to proceed in this case.

## I. BACKGROUND

Trump opened to the public in October 2013, after obtaining the proper licenses from the Commonwealth and entering into a lease. Every weekend or holiday night that Trump opened its doors, uniformed deputies from the Sussex County Sheriff's Office appeared to provide "security services outside and at the door of the facility."[2] (Am. Compl. ¶ 23.) The deputies saw plenty of action while providing these services, making multiple arrests for various criminal violations. (*See* Am. Compl. Ex. H.)

On the nights that the deputies provided security, Trump had no control over the number or identities of the deputies present. Givens served as the point person on most nights, though he indicated that he worked at the direction of Bell. At the end of the night, Givens or his proxy would demand and collect cash payment from Trump for the deputies' services, refusing to accept a check or to provide any sort of documentation. The original cost of services was $25 per hour per deputy, but—as notified by letter from Bell on Sheriff's Office letterhead—increased to $35 per hour per deputy in January 2014.[3] In total, Trump paid the deputies $31,550 in cash.

On January 25, 2014, Givens, at Bell's direction, informed Trump of a reduction in the facility capacity from 624—the maximum occupancy approved by the Virginia Department of Health—to 400. The deputies on scene enforced this reduction by preventing patrons from entering. Trump's management met with Bell and Givens to discuss its concerns, but understood Bell's comments in the meeting as "a veiled threat that [Bell] could have Trump closed if [it] did not cooperate with Givens and him." (Am. Compl. ¶ 36.)

---

[2] Trump also paid private individuals to serve as security inside the facility.
[3] Bell sent an identical letter to Young Men's Social Club in Waverly, Virginia. (Am. Compl. Ex. H.)

On July 12, 2014, Trump planned to open to patrons eighteen years old or older—as opposed to patrons twenty-one or older, as it had been operating.  Trump received clearance from the Virginia Department of Alcoholic Beverage Control ("ABC") to open to these younger patrons.  When Trump informed the Sheriff, however, Bell said "that he would not allow Trump to be open to those under the age of twenty-one," and refused to meet with Trump to discuss it. (Am. Compl. ¶ 41.)  Despite Bell's statement, Trump opened to patrons eighteen years old or older.  The deputies initially refused to allow eighteen- to twenty-year-old patrons into the facility, eventually refusing admission to those twenty-one or older as well.

Trump's management called Bell to protest.  Between expletives, Bell yelled at the management and threatened to shut Trump's facility down.  Bell said he would instruct Trump's landlord to cancel its lease and would work with an ABC employee to take Trump's ABC license.  After the call, Bell came to Trump's facility and, with the assistance of Givens and the other deputies, entered the facility and directed all patrons to leave.  Further, Bell made Trump not only refund the cover charge to patrons, but also pay the deputies who shut down the facility. Finally, Bell told Trump's management: "[I'm] going to revoke your [ABC] license as of Monday[ a]nd I've called [your landlord] . . . [y]our contract has not been extended." (Am. Compl. ¶ 49.)  Bell ended the evening by saying "I want you out—I want you out—no, I want you out of here this week.  Out of my county.  Because you know what?  You have this thug mentality." (Am. Compl. ¶ 49.)  After this evening, "[h]aving reasonable fear of Bell's threats of arrest, Trump's management closed the business and surrendered Trump's ABC license." (Am. Compl. ¶ 68.)  The landlord leased the premises to Empire Restaurant and Lounge, which pays off-duty deputies to provide security services.

## II. DISCUSSION[4]

Trump brings one state law claim and five constitutional claims against Bell and Givens pursuant to 42 U.S.C. § 1983: three under the Due Process Clause, one under the Fourth Amendment, and one under the Equal Protection Clause. The defendants move to dismiss on grounds of qualified immunity.

Qualified immunity protects government officials from liability under § 1983 arising from the performance of discretionary actions within the scope of their authority.[5] *Harlow v.*

---

[4] A Rule 12(b)(6) motion to dismiss gauges the sufficiency of a complaint. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering the motion, a court must accept all allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). "The tenet that a court must accept as true all of the allegations contained in a complaint[, however,] is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a Rule 12(b)(6) motion to dismiss, a complaint must state facts that, when accepted as true, "state a claim to relief that is plausible on its face." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[5] "[I]n order to ensure that public officials are adequately protected from liability, an official's conduct falls within his authority *unless* a reasonable official in the defendant's position would have known that the conduct was clearly established to be beyond the scope of that authority." *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997). Trump argues that the defendants acted beyond the scope of their authority throughout Trump's tenure in Sussex County, thereby nullifying their claim of qualified immunity. Trump, however, oversimplifies this analysis, citing violations of building and Sussex County codes. The Fourth Circuit makes clear that:

> In determining the scope of an official's authority, and whether the act complained of was clearly established to be beyond that authority, the issue is neither whether the official properly exercised his discretionary duties, *nor whether he violated the law*. If these were the relevant inquiries, any illegal action would, by definition, fall outside the scope of an official's authority. . . . Instead, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.

*Id.* (emphasis added) (internal citations omitted). In this case, although the defendants may have violated local codes or other laws, a reasonable official in the defendants' position would not have known that his conduct "was clearly established to be beyond the scope of [his] authority." *Id.* Further, the fact that the defendants were off-duty during some of the events in questions does not move their actions beyond the scope of their authority. *See, e.g., Drewitt v. Pratt*, 999

4

*Fitzgerald*, 457 U.S. 800, 818 (1982). It applies so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). As the Fourth Circuit has said, qualified immunity exists so that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). In other words, qualified immunity "gives ample room for mistaken judgments." *Malley*, 475 U.S. at 343.

The analysis of a qualified immunity claim entails two steps. In the first step, a court must decide "whether a constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003). This includes an analysis, based on the evidence, of the specific right allegedly violated, and a conclusion that such a right exists in the particular circumstances of the case. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). In the second step, a court must determine whether, at the time of the violation, the right was clearly established such that a reasonable officer in the defendant's position would know that his actions would violate that right. *Simmons v. Poe*, 47 F.3d 1370, 1385 (4th Cir. 1995). A court has flexibility in the order in which it must perform this analysis. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("[J]udges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

---

F.2d 774, 778 (4th Cir. 1993) (affirming a district court's grant of summary judgment on § 1983 claims to an off-duty officer working security at a restaurant).

In analyzing the second step, "the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established." *Layne*, 526 U.S. at 615 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Defining the right requires "a high level of particularity." *Edwards v. City of Goldsboro*, 178 F.3d 231, 251 (4th Cir. 1999) (citing *Anderson*, 483 U.S. at 639; *Taylor v. Waters,* 81 F.3d 429, 433 (4th Cir. 1996)); *see, e.g., Layne*, 526 U.S. at 615 ("In this case, the appropriate question is the objective inquiry whether a reasonable officer could have believed that bringing members of the media into a home during the execution of an arrest warrant was lawful, in light of clearly established law and the information the officers possessed."). Indeed, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2084 (2011); *see also id.* (providing the example that "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established").

Once defined, a court then determines whether the right "was clearly established at the time of the claimed violation" by looking at "the decisions of the Supreme Court, [the Fourth Circuit] and the highest court of the state in which the case arose." *Wilson v. Kittoe*, 337 F.3d 392, 402–03 (4th Cir. 2003) (internal alteration and citations omitted) (citing *Edwards*, 178 F.3d at 251); *see also Jean v. Collins*, 155 F.3d 701, 709 (4th Cir. 1998), *cert. granted, vacated on other grounds,* 526 U.S. 1142 (1999) ("[I]f a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense."). While the second step in a qualified immunity analysis "do[es] not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S. Ct. at

2083; *see also Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) *aff'd*, 526 U.S. 603 (1999)

("[A]lthough the exact conduct at issue need not have been held to be unlawful in order for the

law governing an officer's actions to be clearly established, the existing authority must be such

that the unlawfulness of the conduct is manifest."). In other words, at the time of the officer's

actions, "[t]he contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640.

For each of Trump's constitutional claims, the Court will determine first whether the

facts in the complaint allege a violation of constitutional right, then will look to whether that

right was clearly established at the time of the alleged violation.

### A. Due Process Clause

Trump alleges three separate due process violations, specifically: (1) for forcing Trump

to hire and pay off-duty uniformed deputies as security; (2) for decreasing the maximum

occupancy limit of Trump's facility; and (3) for shutting down Trump's facility on July 12, 2014.

The Fourteenth Amendment mandates that "[n]o State shall . . . deprive any person of life,

liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due

Process Clause contains both a procedural and substantive component, "guarantee[ing] more

than fair process . . . to cover a substantive sphere as well, barring certain government actions

regardless of the fairness of the procedures used to implement them." *Cnty. of Sacramento v.*

*Lewis*, 523 U.S. 833, 840 (1998) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997);

*Daniels v. Williams*, 474 U.S. 327, 331 (1986)) (internal quotations omitted). Trump alleges

both procedural and substantive due process violations by the defendants in each of its three

separate claims. The Court will evaluate these three claims as one, and will look at both

procedural and substantive due process in turn.

### *1. Procedural Due Process*

Procedural due process focuses on the procedures involved when a State effectuates a deprivation of protected interests. *Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property."). In order to succeed on a procedural due process claim, a plaintiff must show (1) the existence of a protected interest, (2) the deprivation of that interest by a state actor, and (3) the occurrence of that deprivation without due process of law. *See Tri-County Paving, Inc. v. Ashe Cnty.*, 281 F.3d 430, 436 (4th Cir. 2002) (citing *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 826 (4th Cir. 1995)).

The protected interests covered by the Due Process Clause consist "only . . . of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents v. Roth*, 408 U.S. 564, 570 (1972). "[P]roperty interests . . . extend well beyond actual ownership of real estate, chattels, or money," and "liberty beyond the sort of formal constraints imposed by the criminal process." *Id.* at 571–72. Looking at property interests specifically, the Supreme Court has held that they "are not created by the Constitution . . . [, but] are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577. For example, in *Ruttenberg v. Jones*, the Fourth Circuit found that a billiards club had a property interest in its ABC license and its city permit allowing operation of a business on the premises. 283 F. App'x 121, 129 (4th Cir. 2008).

Turning to the procedural requirements imposed by the Due Process Clause, the type of process required by the Constitution depends in part on the type of deprivation. *See Zinermon v. Burch*, 494 U.S. 113, 126 (1990) ("The constitutional violation actionable under § 1983 is not

complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process. Therefore, to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate."). The Supreme Court "usually has held that the Constitution requires some kind of hearing *before* the State deprives a person of liberty or property." *Id.* at 127–28. "In some circumstances, however, the Court has held that a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." *Id.* at 128. The difference rests on the foreseeability of the state actor's conduct, focusing on whether the State could provide a viable pre-deprivation safeguard.[6]   *See id.* (describing the *Parratt/Hudson* doctrine, which represents a set of cases "in which postdeprivation tort remedies are all the process that is due, simply because they are the only remedies the State could be expected to provide"); *see also Fields v. Durham*, 909 F.2d 94, 97 (4th Cir. 1990) ("In some situations, though, the state cannot foresee, and thus cannot avert through implementation of prescriptive procedures, the deprivation in issue.").

Thus, courts must "first ask whether the risk of erroneous deprivation was foreseeable, and next 'whether predeprivation safeguards would have any value in guarding against the kind of deprivation . . . allegedly suffered.'" *Id.* at 97 (quoting *Zinermon*, 494 U.S. at 132). Courts do not consider a state actor's conduct foreseeable when "deprivations . . . are effected through *random* and *unauthorized* conduct" of a governmental employee, rendering pre-deprivation safeguards "*impracticable* since the state cannot know when such deprivations will occur."

---

[6] Certainly, a local entity could also provide its citizens with pre-deprivation safeguards, but only as empowered by the State. *See Tabler v. Bd. of Supervisors of Fairfax Cnty.*, 221 Va. 200, 202, 269 S.E.2d 358, 359 (1980) (noting that Virginia follows Dillon's Rule, which says that localities have only those powers specifically created, or necessarily implied, by the Commonwealth). For simplicity, the Court will refer to the State as the entity that can provide procedural safeguards since it either provides them itself or empowers localities to do so.

*Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (emphasis added) (internal quotations omitted) (citing *Parratt v. Taylor*, 451 U.S. 527 (1981)). For example, a state actor's conduct qualified as "random and unauthorized" when he seized over 200 animals from a person's property and euthanized all but a few. *Bogart v. Chapell*, 396 F.3d 548, 553, 563 (4th Cir. 2005). On the other hand, a state actor's conduct did not qualify as "random and unauthorized" where "[t]he State delegated [to certain state actors] the power and authority to effect the very deprivation complained of . . . and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful [deprivation]." *Zinermon*, 494 U.S. at 138.

If a state actor's conduct qualifies as unforeseeable, random, and unauthorized, due process requires only a post-deprivation remedy, such as "a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation." *Zinermon*, 494 U.S. at 128; *see, e.g.,* *Freeman v. Town of Eatonville*, 225 F. App'x 775, 780 (11th Cir. 2006) (holding that "Plaintiffs could have pursued remedies in state court for lost profits or damages suffered by [a nightclub's] closure"). The Fourth Circuit has focused specifically on whether "a meaningful postdeprivation remedy for the loss is available." *Bogart*, 396 F.3d at 563 (affirming district court decision that "pointed to Defendants' concession that [Plaintiff] possessed viable state causes of action against them"); *see Yates v. Jamison*, 782 F.2d 1182, 1185 (4th Cir. 1986); *see also Wadhams v. Procunier*, 772 F.2d 75, 77–78 (4th Cir. 1985) (evaluating post-deprivation remedies in light of Virginia Tort Claims Act and state tort law).

In this case, Trump alleges the deprivation of a variety of protected interests by Bell and Givens. The Court assumes without deciding that Trump had protected interests of which the defendants deprived it. Thus, the Court must turn to whether the State, which creates procedural

safeguards, could have foreseen the alleged deprivation, and whether it could have set up pre-deprivation proceedings to guard against it. *Fields*, 909 F.2d at 97.

Bell's and Givens's actions in forcing Trump to pay off-duty uniformed deputies as security, decreasing the maximum occupancy limit, refusing to let Trump open to underage patrons, and shutting Trump's facility down on July 12, 2014, were not foreseeable. Actually, their conduct seems to fall squarely within the "random" and "unauthorized" categories. Indeed, Trump characterized the defendants' conduct as "far beyond the outer limits of legitimate governmental action" and "unjustified by any circumstance or governmental interest." (Am. Compl. ¶¶ 74, 81, 97.) Thus, the Commonwealth could not have set up pre-deprivation safeguards in these unusual circumstances.

Trump's alternative argument, that the defendants' conduct was foreseeable, not random or unauthorized, misreads precedent. For example, Trump argues that "the deputies' conduct was not random . . . , but rather an established and ongoing practice over a series of months." (Trump's Resp. to Givens's Mot. 8; *see also id.* at 9 ("[T]he Defendant's conduct was not a random, one-time event, but rather a practice that continued for some time.")). But the foreseeability inquiry focuses on foreseeability by the State—the entity who could effectuate pre-deprivation safeguards—not on foreseeability by the defendants themselves. *See Fields*, 909 F.2d at 97 ("In some situations . . . *the state* cannot foresee, and thus cannot avert through implementation of prescriptive procedures, the deprivation in issue.") (emphasis added).

Trump's attempt to analogize this case to *Zinermon* also misses the mark. Trump runs through established procedures found in various state and local codes for billing off-duty services through the county treasurer, lowering occupancy limits through the local building department, and revoking an ABC license through the Virginia ABC Board. (*See* Trump's Resp.

11

to Givens's Mot. 7, 10, 11–12.)  By Trump's own descriptions, each of these procedures grants authority to some entity other than the local sheriff's department.  This obviously differs from *Zinermon*, where "[t]he State delegated [certain state actors] the power and authority to effect the very deprivation complained of . . . and also delegated to them the concomitant duty to initiate the procedural safeguards set up by state law to guard against unlawful [deprivation]." *Zinermon*, 494 U.S. at 138.  In this case, the Commonwealth could not foresee that the local sheriff's department would overtake these particular duties for a particular business, and therefore could not set up a procedure to address these actions.

As the defendants' conduct in this case was unforeseeable, the availability of meaningful post-deprivation remedies will satisfy due process. *See Zinermon*, 494 U.S. at 128.  Here, Trump has post-deprivation remedies.  Indeed, the Court need look no further than the amended complaint, where Trump brings a state law claim of business conspiracy, seeking $7,500,000. (Am. Compl. ¶¶ 116–19.)  State tort law also provides other claims that could possibly apply here, such as trespass, conversion, interference with contract, and interference with contractual expectations.

Accordingly, because the defendants' conduct depriving Trump of constitutionally protected interests was not foreseeable, and because of the available post-deprivation remedies, Trump does not allege a violation of its right to procedural due process, failing step one of the qualified immunity analysis.

Even if Trump could state a violation, however, the right was not clearly established such that a reasonable officer in the defendants' positions would know that his actions would have violated that right.  Indeed, the plaintiff does not cite a single case showing that the violations here are clearly established.

### 2. *Substantive Due Process*

Unlike procedural due process, substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests," *Glucksberg*, 521 U.S. at 720, "regardless of the fairness of the procedures used to implement [the government actions]," *Lewis*, 523 U.S. at 840 (internal citation and quotations omitted). Importantly, however,

> Because [the Supreme Court] ha[s] always been reluctant to expand the concept of substantive due process, [it] held in *Graham v. Connor*, 490 U.S. 386 (1989), that where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.

*Id.* at 842 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992); *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (Rehnquist, C.J.)) (internal quotations omitted). In other words, "*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth . . . Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *Id.* at 843 (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)); *see Presley v. City of Charlottesville*, 464 F.3d 480, 491 (4th Cir. 2006).

In this case, specific constitutional provisions—the Fourth Amendment (discussed below) and, to an extent, procedural due process (discussed above)—cover the defendants' conduct. Accordingly, those "Amendment[s], not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Lewis*, 523 U.S. at 842.

Thus, Trump fails to allege a violation of its substantive due process right. The Court, therefore, grants the defendants' motions to dismiss Trump's due process claims.

### B. Fourth Amendment

Next, Trump alleges that Bell and Givens unreasonably seized Trump's facility in violation of the Fourth Amendment when they entered and shut down the facility on July 12, 2014. The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Focusing on seizures specifically, "[a] 'seizure' of property . . . occurs when 'there is some meaningful interference with an individual's possessory interest in that property.'" *Soldal v. Cook Cnty.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Only if the seizure was unreasonable, however, can a court entertain an action for violation of the Fourth Amendment. *Id.* at 71 ("[R]easonableness is still the ultimate standard under the Fourth Amendment.") (internal citation and quotations omitted). The protection against unreasonable seizures extends to commercial property, *New York v. Burger*, 482 U.S. 691, 699 (1987), real property, *Presley*, 464 F.3d at 483–84, and temporary or partial seizures, *id.* at 487.

In evaluating reasonableness, the "determination will reflect a careful balancing of governmental and private interests." *Soldal*, 506 U.S. at 71 (internal citation omitted). Whether the officer had a warrant for the seizure is one measure of the reasonableness analysis,[7] but is not dispositive. *See, e.g.*, *Freeman v. City of Dallas*, 242 F.3d 642, 647 (5th Cir. 2001). In the end, "reasonableness is . . . the ultimate standard under the Fourth Amendment." *Soldal*, 506 U.S. at 71 (internal citation and quotations omitted).

---

[7] *Cf. United States v. Brown*, 701 F.3d 120, 126 (4th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)) ("Although warrantless searches and seizures are considered to be 'per se unreasonable,' there are 'a few specifically established and well-delineated exceptions to the search warrant requirement."),

14

In this case, the Court finds that Trump has alleged a seizure by the defendants, as the defendants meaningfully interfered with Trump's possessory interest in its facility. For purposes of this motion, the Court will assume that the seizure was unreasonable.

Nevertheless, the asserted right was not clearly established on the night in question such that reasonable officers in the defendants' position would know that their actions would violate that right. Defining the right at the "high level of particularity" required under a qualified immunity analysis, the Court asks whether a reasonable officer could have believed that closing down an alcohol-serving establishment with a history of criminal violations qualified as an unlawful seizure, in light of clearly established law.

No case law exists in this circuit—or elsewhere, as far as the Court can find—to clearly establish a violation of Trump's particular constitutional right. The parties discuss four cases— *Freeman v. Town of Eatonville*, 225 F. A'ppx 775 (11th Cir. 2006); *Cottom v. Town of Seven Devils*, 30 F. App'x 230 (4th Cir. 2002); *Kardi v. Jenkins*, 7 F. App'x 185 (4th Cir. 2001); and *Turner v. Dammon*, 848 F.2d 440 (4th Cir. 1988)—none of which are on point. (Trump's Resp. to Bell's Mot. 19–21). The Court also looked to *Presley v. City of Charlottesville*, 464 F.3d at 491, and *Freeman v. City of Dallas*, 242 F.3d 642 (5th Cir. 2001), which analyze the seizure of property, but not in a context at all similar to Trump's. Finally, *Club Retro, LLC v. Hilton*, 568 F.3d 181 (5th Cir. 2009), analyzes a raid on a club, but focuses on the state actors' search—not seizure—and comes from the Fifth Circuit.

Accordingly, assuming Bell and Givens violated Trump's constitutional right under the Fourth Amendment, Trump's right was not clearly established at the time of the alleged violation. Thus, the Court grants the defendants' motions to dismiss Trump's Fourth Amendment claim on qualified immunity grounds.

### C. Equal Protection Clause

Finally, Trump alleges that Bell and Givens treated Trump differently than other similarly situated businesses in the area, businesses that Bell and Givens allegedly did not force to hire and pay off-duty uniformed deputies as security, decrease the maximum occupancy limit of, refuse to let open to underage patrons, or shut down. The Fourteenth Amendment mandates that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "It requires that the states apply each law, within its scope, equally to persons similarly situated. . . . But this does not mean that persons in different circumstances cannot be treated differently under the law." *Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 818 (4th Cir. 1995).

Bell and Givens construe Trump's equal protection claim as a selective enforcement claim, which "requires a plaintiff to demonstrate that the government's enforcement process 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Cent. Radio Co. Inc. v. City of Norfolk*, 811 F.3d 625, 634–35 (4th Cir. 2016) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)); *see also id.* ("Thus, a plaintiff must show not only that similarly situated individuals were treated differently, but that there was 'clear and intentional discrimination.'" (quoting *Sylvia Dev. Corp.*, 48 F.3d at 825)). On the other hand, Trump argues its claim as one brought by a "class of one," requiring the plaintiff to allege "that [it] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Regardless of which test the Court applies, Trump's equal protection claim fails because it does not allege facts supporting the claim that the defendants treated Trump differently than similarly situated businesses, a core requirement of any equal protection claim. *See Sylvia Dev.*

*Corp.*, 48 F.3d at 818.   In its amended complaint, Trump lists twelve other businesses in Sussex County that have a business license, an ABC license, and a license to operate as a food establishment.   (Am. Compl. ¶¶ 110–11.)   The commonality of these licenses, however, does not equate to similarly situated.   Indeed, Trump does not allege any facts to suggest that these other businesses—most of which seem to be restaurants open to the public—are similarly situated with a restaurant and lounge that generally opened only to patrons over twenty-one on weekends and holidays.   Trump provides additional information only on the Young Men's Social Club (to whom Bell sent a letter increasing the rate of security at club events to $35 per hour per deputy, (Am. Compl. Ex. H)) and Empire Restaurant and Lounge (which moved into Trump's old site after it closed and for whom the deputies serve as paid security, (Am. Compl. ¶ 118(c))).   Based on this information, it seems that the defendants actually treated the other similarly situated businesses in Sussex County, Young Men's Social Club and Empire Restaurant and Lounge, the same as they treated Trump.   Accordingly, Trump does not allege a violation of its right to equal protection, failing step one of the qualified immunity analysis.   Even if Trump could state such a violation, however, the right was not clearly established such that a reasonable officer in the defendants' positions would know that his actions would have violated that right.

Thus, the Court grants the defendants' motions to dismiss Trump's equal protection claim.

## III. <u>CONCLUSION</u>

In conclusion, qualified immunity protects the defendants against Trump's constitutional claims.   Accordingly, the Court GRANTS the defendants' motions to dismiss these five claims. With only the state law claim remaining, the Court declines to exercise jurisdiction.   28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim

. . . if . . . the district court has dismissed all claims over which it has original jurisdiction.").

Thus, the Court DENIES the defendants' motion to dismiss the state law claim as MOOT, and

DISMISSES this remaining claim WITHOUT PREJUDICE.

The Court will enter an appropriate order.

Let the Clerk send a copy of this Opinion to all counsel of record.

Date: ___5/18/16___
Richmond, VA

_/s/_
John A. Gibney, Jr.
**United States District Judge**